No.  92-333

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

MICHAEL BLYTHE,

      Plaintiff and Appellant,

  -v-

RADIOMETER AMERICA, INC.,
COMMUNITY MEDICAL CENTER, INC.,
and MICHAEL BIGGINS,

      Defendants and Respondents.



DEC 22 1993

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Fourth Judicial District,
              In and for the County of Missoula,
              The Honorable Douglas Harkin, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           Thomas  W.  Frizzell,  Tipp,  Frizzell  &  Buley,
           Missoula, Montana

      For Respondent:

           Charles  McNeil,  Garlington,  Lohn  &  Robinson,
           Missoula, Montana

Submitted:  May 25, 1993

Decided:  December 22, 1993

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff Michael Blythe appeals from an order of the District Court of the Fourth Judicial District, Missoula County, dismissing his complaint charging that defendants Community Medical Center, Inc. and Michael Biggins had injured him by requiring him to use a defective medical device. Plaintiff's complaint against Radiometer America, Inc. has been dismissed and removed to United States District Court. We affirm.

The issues presented for review are restated as follows:

1. Does the Workers' Compensation Act provide Blythe with the exclusive remedy for his injury resulting from his employer's decision to require its employees to use defective Arterial Blood Gas kits?

2. Does the exclusivity clause apply to plaintiff's claim for breach of contract?

In January 1989, Michael Blythe (Blythe) was employed by Community Medical Center, Inc. (CMC) as a Respiratory Therapist, a position he had held for ten years. Blythe worked with seriously ill patients, including those recovering from major heart surgery and those suffering from communicable diseases.

Blythe's job duties included assisting patients with life support respirators and periodically testing their arterial blood. Testing a patient's blood involved taking a blood sample from the patient using a device called an Arterial Blood Gas kit (ABG kit). An ABG kit is a syringe classified by the Food and Drug Administration (FDA) as a Class II medical device, defined by the

2

FDA as a device involved in life-sustaining measures. The FDA regulates and monitors the manufacture of these devices. It is illegal to sell, receive, possess, or transport in interstate commerce any Class II device which is adulterated, misbranded, or not manufactured according to standards.

Defendant Michael Biggins (Biggins) was Blythe's supervisor and the head of the CMC respiratory care department. In late 1988 or early 1989, Biggins agreed with a Radiometer America, Inc. (Radiometer) sales representative to accept certain ABG kits at little or no cost. These kits were defectively manufactured and could result in needle-stick injuries to the user if the hypodermic needle loosened. If that occurred, the user could be inoculated with the contents of the syringe.

Blythe alleges that Radiometer's sales representative and Biggins explained to some but not all of the workers who used the ABG kits how the kits were defective and how to use them to try to avoid injury. The following comments were handwritten on the box in which the kits were stored in inventory:

"Free rejects?"

"Yes"

"When using needle may screw past it's mark into hub of serenge (sic)--can still use, but be aware of this"

These defective ABG kits were the only ABG kits available for use in CMC's respiratory care unit.

On January 29, 1989, Blythe received a sample of arterial blood from a co-worker which had been taken from a patient who was infected with the HIV virus, had contracted AIDS and suffered from

3

other AIDS-related infections. As Blythe uncapped the needle from the syringe containing the patient's blood, he stuck himself in the hand with the needle. According to Blythe, he cleaned the wound and immediately went to CMC's emergency room, where the physician on duty told him that he had probably five to six years before he came down with AIDS. As of the date of this appeal, Blythe had not tested positive for the HIV virus.

Although Blythe continued to work after the injury, he began having psychological problems, including auditory hallucinations such as loud demonic voices. According to Blythe, he was losing touch with reality and developing hopelessness and depression because of his fear of contracting AIDS. Although CMC provided Blythe with the services of a company psychologist, his symptoms grew worse. Blythe consulted other professionals in addition to the CMC psychologist. In October 1989, he was diagnosed as psychotic. Blythe has been unable to work since March 1991 and now receives medical and disability benefits under the Workers' Compensation Act.

The District Court dismissed Blythe's complaint against CMC and Biggins based on the exclusivity clause of the Workers' Compensation Act. The standard of review for a district court's interpretations of the law is whether they are correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603.

## ISSUE I

Does the Workers' Compensation Act provide Blythe with the exclusive remedy for his injury resulting from his employer's

4

decision to require its employees to use defective Arterial Blood Gas kits?

Section 39-71-411, MCA, of the Workers' Compensation Act (the Act) provides that the provisions of the Act are the exclusive remedy available to a worker who is injured on the job. This is known as the "exclusivity clause."

The Act provides an exception which allows an injured worker to sue in tort in certain limited circumstances, set forth in § 39-71-413, MCA, as follows:

> **Liability of fellow employee for intentional and malicious acts or omissions -- additional cause of action.** If an employee receives an injury while performing the duties of his employment and the injury or injuries so received by the employee are caused by the <u>intentional and malicious act or omission of a servant or employee of his employer</u>, then the employee . . . shall, in addition to the right to receive compensation under the Workers' Compensation Act, have a right to prosecute any cause of action he may have for damages against the servants or employees of his employer causing the injury. (Emphasis supplied.)

While § 39-71-413, MCA, covers intentional acts of a servant or employee, this Court has held further that employers may be sued for workplace injuries under limited circumstances. <u>See</u> Great Western Sugar Co. v. Dist. Court (1980), 188 Mont. 1, 610 P.2d 717. In <u>Great Western</u>, we also specified the degree of intent required to meet the standard set forth in § 39-71-413, MCA:

> . . . "[I]ntentional harm" which removes an employer from the protection of the exclusivity clause of the Workers' Compensation Act is such harm as it <u>maliciously and specifically directed at an employee, or class of employee out of which such specific intentional harm the employee receives injuries as a proximate result</u>. Any incident involving a lesser degree of intent or general degree of negligence not pointed specifically and directly at the injured employee is barred by the

5

exclusivity clause as a basis for recovery against the employer outside the Workers' Compensation Act. (Emphasis supplied.)

Great Western, 610 P.2d at 720.

This Court has allowed the employee to sue an employer for intentional torts in some cases. See, e.g., Sitzman v. Shumaker (1986), 221 Mont. 304, 718 P.2d 657 (employee was the victim of his employer's assault and battery); and Vesel v. Jardine Mining Co. (1940) 110 Mont. 82, 100 P.2d 75 (employee received metal in eye and employer intentionally chose unqualified medical provider).

Unless the harm is "maliciously and specifically directed at an employee or a class of employees," workers are limited to the remedy provided under the Act. For example, the plaintiff in Great Western had alleged that his employer "wantonly, maliciously and carelessly placed him in a position of danger, committing the equivalent of an intentional harm." Because the complaint alleged no more than negligence, this Court held that the Act provided the plaintiff's exclusive remedy. Great Western, 610 P.2d at 719-20.

Grossly negligent conduct of an employer or a co-employee has not been classified as "intentional and malicious." See, e.g., Adsem v. Roske (1986), 224 Mont. 269, 728 P.2d 1352 (claimant was killed by collapsed walls in a deep trench which had no sloping or shoring); Enberg v. Anaconda Co. (1971), 158 Mont. 135, 489 P.2d 1036 (employer violated its own safety standards as well as other statutes in mine blasting); and Dvorak v. Matador Serv., Inc. (1986) 223 Mont. 98, 727 P.2d 1306 (employee injured by toxic materials inside tank of a truck when employer knew a tank could

6

contain matter contaminated with hydrogen sulfide and insisted employee enter the tank of a truck to do welding repairs).

Before we consider Blythe's arguments on other theories, we emphasize that Blythe has failed to meet the requirements set forth in Great Western and also in Noonan v. Spring Creek Forest Products, Inc. (1985), 216 Mont. 221, 700 P.2d 623. Under Great Western, Blythe was required to show the presence of intentional harm which his employer maliciously and specifically directed at him, and that he was injured as a proximate result of that specific intentional harm. Blythe has not demonstrated any intentional harm maliciously and specifically directed at him or any of his co-employees. We therefore conclude that Blythe has failed to meet the standard of intentional harm required by Great Western.

Noonan contains factual precedent which is helpful in the present case. In Noonan, the employer required the worker to run a broken planer. The employer had removed the safety guard on the planer, which violated OSHA regulations. The on/off switch on the planer was broken and employees were required to run the machine continuously, even while retrieving wood pieces which became caught in the planer. Other employees had asked the employer to repair the planer. The worker, a nineteen-year-old recent high school graduate who was starting his first full-time job, was required to feed rough-cut lumber through the planer.

In Noonan, the employer knew these facts and knew that other employees had been injured, yet it concealed the information from the worker. The worker's hand was drawn into the planer and

7

severely injured when he reached in to remove a piece of wood which had become stuck in the planer. Under these facts, this Court concluded that Noonan's employer was not guilty of the type of intentional harm which removes an employer from the protection of the Act's exclusivity clause. We stated:

> We have reviewed each of the plaintiff's alleged facts set forth above and fail to discern how any of the specific facts could be interpreted to mean harm was specifically directed at Noonan. The facts do establish that the owners of Spring Creek operated a hazardous and dangerous workplace. The number of injuries that occurred among a relatively small number of workers provides ample support for this observation. However, to translate this situation into an inference of tortious intent on behalf of the employer would require a standard of law that this Court has thus far refused to adopt.
>
> Where an employee's allegations go no further than to charge an employer with knowledge of a hazardous machine, the complaint does not state a cause outside the purview of our exclusive remedy statute. (Emphasis supplied.)

Noonan, 700 P.2d at 625-26.

Blythe has failed to address this Court's holding in Noonan. In Noonan, this Court concluded that the complaint failed to state a cause of action outside the purview of the exclusivity statute where the allegations only demonstrated an employer who had knowledge of a hazardous machine. We conclude that this rationale applies to the present case. Here, the most that Blythe has demonstrated is that his employer knew of the defective and hazardous character of the medical devices which Blythe and other employees were required to use. We conclude that under Noonan, Blythe has failed to state a cause of action which removed his employer from the protection of the exclusivity clause of the Act.

8

In *Noonan*, we discussed a line of cases from a minority of jurisdictions which have recognized an intentional tort action for situations where the employee cannot show a specific intent to injure, but rather where the employer knows or believes that harm is a "substantially certain" consequence of the unsafe workplace. *Noonan*, 700 P.2d at 625-26. West Virginia, Ohio and some Louisiana courts have used this "substantially certain" test. In his treatise on workers' compensation, Professor Larson states:

> . . . [T]he various efforts . . . to stretch the concept of intentional injury are not undertaken in the name of discovering a truer and higher meaning of "intentional"; they are undertaken because these courts still cannot quite accept the non-fault nature of workers' compensation, and have taken it on themselves to change the statutory scheme to conform more closely to their values. . . .

> . . . The most cogent argument against this type of holding is an intensely practical one: the difficulty of drawing an effective distinction, once this door has been opened, to prevent the virtual destruction of the exclusiveness principle, as evidenced by the experience of Ohio and Louisiana.

2A A. Larson, Workers' Compensation Law § 68.15, at 13-58 to 13-59.

Blythe recognizes that this Court reviewed the leading cases espousing the minority rule and that we declined to change our course by adopting the "substantially certain" test in *Noonan* and he professes that he is not arguing that this Court should adopt it now. However, he presents several arguments which essentially reargue the "substantially certain" theory.

Blythe first contends that this case is different from other cases involving willful violations of safety standards because it is not the type of risk ordinarily undertaken in the workplace and

9

because the employer specifically intended to violate the law. This argument attempts to equate an employer's willful violation of the law to specific intent by employing the reasoning of the "substantially certain" test which we have declined to adopt. Intent to violate the law does not equate to intentional harm that is maliciously and specifically directed at an employee or group of employees.

Blythe next contends that the leading treatise on workers' compensation law supports his position that specific intent is not required. This too is essentially an argument for the "substantially certain" test. We do not interpret the treatise's discussion of intent in this manner. Professor Larson states:

> [I]t seems prudent to hold the line, as the vast majority have done, in saying that "intentional injury" means "intended injury." . . .This is by no means the only area of compensation law in which, to be administrable and kept within bounds, a rule must be so arbitrary that it produces some "injustice" on its fringes.

2A A. Larson, Workers' Compensation Law § 68.15, at 13-68.

Blythe frames a third argument for the "substantially certain" test by claiming that he was subjected to what he calls an "active injurious force" and which Larson would classify as an exception to exclusivity under the majority rule. Blythe coined the phrase "active injurious force" from the following:

> [T]he element of uncertainty is not whether the worker is apt to be exposed to the active force (whether cave-in or toxic fumes), but whether the active force to which the worker is knowingly exposed, proves to be injurious.

2A A. Larson, Workers' Compensation Law § 68.15, at 13-68. Larson

10

discusses this active force in the context of distinguishing the majority and minority rules.

Larson illustrates an intentional infliction of harm caused by what Blythe calls an "active injurious force" and which is actionable in tort by reference to the facts of People v. Film Recovery Sys. (Ill. App. 1990), 550 N.E.2d 1090. See Beauchamp v. Dow Chemical Co. (Mich. 1986), 398 N.W.2d 882, 892. Larson points out that in Film Recovery, the employer knew that the employees consistently inhaled fumes, knew that inhaling fumes caused harmful consequences, and purposely withheld this information from the employees. The employer also knew that the employees would not continue to do the work if they were aware that they were being injured by inhaling the chemical fumes.

Larson contrasts cases like Film Recovery, where the employer knows the employee is being injured, to the situation where the employer exposes the employee to harm but does not know with certainty that the employee is being harmed or will be harmed. 2A A. Larson, Workers' Compensation Law § 68.15. Larson uses the case of an employee working in a ditch who is subsequently injured by a cave-in of the ditch walls as an example of the latter. See, e.g., Adsem, 728 P.2d 1352 (forcing employee to work in trench which subsequently collapsed and killed employee was not intentional conduct with known consequences specifically directed at the employee).

In the case before us, CMC provided only defective ABG kits for its employees to use. Although CMC may have been aware that

11

there was risk of injury as illustrated by the fact that it warned employees and trained some of them on how to use them to avoid injury, CMC did not force its employees to use the defective ABG kits with knowledge that they would be certain to sustain injury. Further, CMC did not withhold information from employees that the ABG kits were defective. We therefore conclude that Blythe's injury is not analogous to the active force in _Film Recovery_ where the employer knew the employee was being harmed and continued to expose the employee to known harm after failing to disclose warnings on chemicals.

We reject all Blythe's arguments as detailed above which attempt to reargue the minority rule by couching it in other terms.

## Malice

Blythe presents another argument concerning the meaning of "malice" which this Court has not previously considered. He contends that his injuries now come within the exception to the Act's exclusivity clause because the definition of "actual malice" in § 27-1-221(2), MCA, changes the _Great Western_ standard.

As set forth above, the type of intentional harm which exposes an employer to tort liability under _Great Western_ is that which is _maliciously_ and specifically directed at the employee or class of employee. The word "maliciously" as used by the Court in _Great Western_ has a well-known meaning in Montana. Section 1-1-204(3), MCA, defines "malice" as follows:

> "Malice" and "maliciously" denote a wish to vex, annoy, or injure another person . . .

12

Miller's Mutual Ins. Co. v. Strainer (1983), 204 Mont. 162, 168, 663 P.2d 338, 341, referred to this statute in a workers' compensation case, concluding that intent to injure an employee does not require specific intent to cause the precise resulting injury. We emphasize again that the plaintiff has failed to demonstrate intentional harm <u>maliciously</u> and specifically directed at him or any class of employee, according to the <u>Great Western</u> standard.

However, Blythe contends that the <u>Great Western</u> standard has been changed because the definition of malice in § 1-1-204(3), MCA, no longer applies to determine whether an injury is "intentional" within the meaning of § 39-71-413, MCA. He contends that this definition has been superseded by the legislature's definition of "actual malice" in § 27-1-221(2), MCA, which applies to the Act through § 1-2-107, MCA. Section 1-2-107, MCA, provides that where the meaning of a word is defined in part of the code, the definition is applicable wherever it occurs throughout the code, except where a contrary intention is clearly apparent. This Court has not reviewed a case on exclusivity since that statute was enacted in 1987.

Section 27-1-221, MCA, defines "actual malice" as follows:

**Punitive damages--liability--proof--award.** . . .
(2) A defendant is guilty of actual malice if he has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
(a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
(b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

13

Blythe compares the above section to the definition of "knowingly" in § 45-2-101(33), MCA, where proof that a person is aware of a high probability of the existence of a particular fact will establish an element of a criminal offense. Blythe further argues that the legislature's adoption of the definition of "actual malice" in § 27-1-221(2), MCA, from the criminal code's definition of "knowingly" rather than "purposely" rejects the notion that the wrongdoer must have a specific intent to injure; rather, he contends that the level of certainty required now for exception to exclusivity under the Act is the same as in the criminal code:

> **45-2-101. General definitions.** . . . (33) "Knowingly"-- a person acts knowingly with respect to the result of conduct described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct. When knowledge of the existence of a particular fact is an element of an offense, knowledge is established if a person is aware of a high probability of its existence.

Blythe contends that the legislature has rejected the notion that the wrongdoer must have a specific intent to injure while retaining the distinction made by this Court when it held in Miller's Mutual that malice can be found where the acts are intended though the consequences are not. Blythe further contends that CMC demonstrated its intent to do a wrongful act under the new definition of "actual malice," by accepting and requiring employees to use the unlawfully-possessed ABG kits with knowledge of their defect and the possibility of injury.

As emphasized above, the conduct here does not qualify as malicious if we use the definition of "malice" used in prior exclusivity cases. The rationale of Noonan applies directly to the

14

present case where the most that can be charged is that the employer knew of the defective and hazardous medical device which the plaintiff was required to use.

The stated intent in House Bill 442 enacted by the 1987 legislature in revising §§ 27-1-220 and 221, MCA (1985), was to revise the law relating to punitive damages--limiting the right to recover punitive damages, restricting the award of punitive damages in contract actions and permitting insurance coverage of punitive damages. 1987 Mont. Laws 1722. The legislature did not repeal the definition of malice in § 1-1-204(3), MCA, or otherwise indicate that the changes in the punitive damages section applied to any other part of the code, including the chapter governing workers' compensation awards.

It is our duty to restrict the meaning of general words whenever necessary so as to carry out the legislative intent. In re Takahashi's Estate (1942), 113 Mont. 490, 494, 129 P.2d 217, 220. The context in which the word is used must be considered, and the word, together with the context, then gives the meaning sought to be conveyed. Takahashi's Estate, 129 P.2d at 221. In addition to viewing the word within its context, we presume that the legislature enacts a law with full knowledge of all existing laws on the same subject, including workers' compensation laws and does not intend to abrogate or interfere with another law on the same matter unless the repugnancy between the two is irreconcilable. Fletcher v. Paige (1950), 124 Mont. 114, 119, 220 P.2d 484, 487.

15

When an employee is injured on the job, the Act generally provides the exclusive remedy. If the injury is compensated under the Act, the employee is not allowed other remedies provided for by other statutes, including punitive damages. Section 27-1-221, MCA, provides for punitive damages for injuries underline(outside) the limits of the Act. We conclude that the legislature did not intend the definition of "actual malice" in § 27-1-221(2), MCA, to apply to determine whether conduct qualifies as an exception to the exclusive remedy under the Act. We further conclude that the definition of "actual malice" set forth in § 27-1-221(2), MCA, was intended for purposes of punitive damages awards and is specifically not applicable to the Act.

We hold the Workers' Compensation Act provides Blythe with the exclusive remedy for his injury resulting from his employer's decision to require its employees to use defective ABG kits.

## ISSUE II.

Does the exclusivity clause of the Workers' Compensation Act apply to plaintiff's claim for breach of contract?

Blythe contends that if his tort claim is barred by the exclusivity provision in the Act, he should be allowed to bring an action for breach of his employment contract. He contends that his employment contract with CMC carried a duty of good faith in its performance and CMC is liable in damages upon breach.

Blythe maintains that his employer had the discretion to choose the equipment to be used and he was required to do as he was told by his employer. He contends that CMC's decision to provide dangerously defective equipment which cannot be commercially sold

16

was a breach which deprived Blythe of the benefit of his contract by eliminating his right to practice his profession and earn his living. Blythe contends that contract damages here, unlike most contract actions, would include emotional distress damages because the action involves actual physical injury.

If this attempt to create a cause of action for breach of contract under these facts were to prevail, every employer/employee relationship might involve contractual issues, resulting in exposure of each employer beyond the Act. Such a result would undermine the workers' compensation system.

Larson's treatise on workers' compensation states:

> The all-inclusive character of the exclusiveness principle results in barring actions for covered injuries even though the plaintiff casts his action in the form of a breach of some kind of contract.

2A A. Larson, Workers' Compensation Law § 65.38, at 12-37.

We conclude that Blythe is further barred by the exclusivity provision in § 39-71-411, MCA, from bringing an action for breach of the employment contract. We are supported in this decision by courts of numerous other jurisdictions which have addressed the issue.

We hold plaintiff's claim for breach of contract, pled alternatively to the tort claim, fails to state a claim for which relief can be granted.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

17

_____

_____

_____
                 Justices

District Judge Ted O. Lympus
sitting for Justice R. C.
McDonough

18

Justice Terry N. Trieweiler dissenting.

I dissent from the majority's conclusion that the Workers' Compensation Act provides Michael Blythe with his exclusive remedy for the injury he sustained during the course of his employment with the Community Medical Center.

Blythe's complaint in this case was dismissed for failure to state a claim pursuant to Rule 12(b)(6), M.R.Civ.P. We have previously held that:

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A motion to dismiss under Rule 12(b)(6), M.R.Civ.P., has the effect of admitting all well-pleaded allegations in the complaint. In considering the motion, the complaint is construed in the light most favorable to the plaintiff, and all allegations of fact contained therein are taken as true. [Citations omitted.]

*Willson v. Taylor* (1981), 194 Mont. 123, 126, 634 P.2d 1180, 1182.

With that standard in mind, we assume the following facts to be true:

Michael Blythe was employed as a respiratory therapist for the Community Medical Center in Missoula during January 1989. Prior to that time, the Medical Center had been having financial difficulties, and therefore, the head of the respiratory care department accepted free arterial blood gas kits, knowing that they were defective. Patients, however, were charged the regular price for this equipment.

Although the head of the respiratory care department knew the kits were defective, he did not advise all of the therapists who

19

would use those kits during the course of their employment. Instead, the kits were placed with other equipment inventory for use.

The danger to which employees were exposed from the defective kits was the danger that the needle would come loose and cause a needle-stick injury to the employee. As a result, the disease for which patients were being treated could be transmitted to the health care provider using the kit. Hospital administrators knew that a needle-stick injury resulting from use of the defective kits could transmit diseases, such as AIDS and hepatitis B to its employees.

At about 6 a.m. on Sunday morning, January 29, 1989, Blythe was using a defective arterial blood gas kit on a patient who suffered staph and strep infection, pneumonia, herpes, the AIDS virus, and hepatitis B. Because of the defect in the kit, he was stuck by the needle and exposed to contamination from the patient's blood-born diseases. He was subsequently advised by an emergency room physician that "well, you've got five or six years before you come down with AIDS."

As a result of his injury and the mental strain from concern for his future health, Blythe has suffered severe and totally disabling mental problems.

Blythe alleged, and therefore, we assume it to be true, that when his superiors provided him with defective blood gas kits they acted intentionally and with actual malice. In other words, he alleged that the hospital intentionally provided its employees with

20

defective blood gas kits, knowing that they were exposed to severe and terminal harm in the exact manner that Blythe alleges he was harmed, but disregarding that potential harm because of the economic benefit it hoped to realize from doing so.

The majority discusses its prior decisions, language from a treatise, and a selected statutory definition of "malice" to support its conclusion. However, the rule which excepts intentional conduct on the part of an employer from the exclusivity of the Workers' Compensation Act is statutory and is neither as restrictive nor demanding as this Court's prior decisions. It simply states that:

> If an employee receives an injury while performing the duties of his employment and the injury or injuries so received by the employee are caused by the intentional and malicious act or omission of a servant or employee of his employer, then the employee . . . shall, in addition to the right to receive compensation under the Workers' Compensation Act, have a right to prosecute any cause of action he may have for damages against the servants or employees of his employer causing the injury.

Section 39-71-413, MCA.

There is no question, based on the allegations in the complaint, that Blythe's supervisor acted intentionally when he purchased defective arterial blood gas kits from the hospital's supplier. The question is whether, based on the allegations in the complaint, his act was also malicious.

Stripping an employer from the protection provided by the Workers' Compensation Act based on intentional conduct is a punitive remedy intended to deter employers from intentionally harming their employees. Therefore, it is most logical to apply

21

the statutory definition of malice found at § 27-1-221(2), MCA, Montana's punitive damage statute. There, the Legislature has stated that:

> A defendant is guilty of actual malice if he has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
>
> (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
>
> (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

By that definition of malice, Blythe's complaint satisfies all of the elements necessary to overcome defendants' motion to dismiss pursuant to Rule 12(b)(6), M.R.Civ.P.

The majority relies on the definition of malice found at § 1-1-204(3), MCA, but fails to distinguish its previous decision in *Millers Mutual Insurance Company v. Strainer* (1983), 204 Mont. 162, 663 P.2d 338, where this Court applied the term "malice" in a workers' compensation context much more expansively than it does here. In that case, we held that:

> Respondent argues that for one to act maliciously one must necessarily intend the consequences of the act. Respondent relies on *Boyer v. Kloepfer* (1976), 170 Mont. 472, 554 P.2d 1116, wherein this Court equated malice with an intent to injure. However, the general definition of malice is more expansive. In *Cashin v. Northern Pac. R. Co.* (1934), 96 Mont. 92, 28 P.2d 862, this Court defined malice as "a wish to vex, annoy, or injure another person, *or* an intent to do a wrongful act. (Emphasis supplied). The Montana Supreme Court has also implied malice where the intentional acts of a defendant were committed without justifiable excuse, privilege or defense. *Poeppel v. Fisher* (1977), 175 Mont. 136, 572 P.2d 912. We hold that malice can be found where acts are intentional though the consequences are not.

22

. . . .

> In summary, we hold that section 39-71-413, of the Workers' Compensation Act, permits the filing of a third-party action where acts of an employee are intentional irrespective of whether the results of that act were intended.

*Strainer*, 663 P.2d at 341-42.

Our holding in *Strainer* suggests that for purposes of construing the term "malice," as it is used in § 39-71-413, MCA, the statutory definition provided for in § 27-1-221(2), MCA, is much more appropriate than the restrictive language found at § 1-1-204(3), MCA, which was specifically rejected in the *Strainer* decision.

The majority also relies on its prior decisions in *Great Western Sugar Company v. District Court* (1980), 188 Mont. 1, 610 P.2d 717, and *Noonan v. Spring Creek Forest Products, Inc.* (1985), 216 Mont. 221, 700 P.2d 623, for the principle that an intentional act which removes an employer from the protection of the exclusivity clause of the Workers' Compensation Act requires "intentional harm" and an act directed at the specific employee, or a class of employees to which he or she belongs. However, those requirements clearly go beyond the plain terms of § 39-71-413, MCA, and are inconsistent with this Court's prior decision in *Strainer*. While it is true that since 1987 the Court is not required to construe the Workers' Compensation Act liberally in favor of the employee, there certainly is no requirement that it be construed liberally in favor of the employer. That should be especially true where the issue is

23

compensation for an employee injured by an allegedly intentional and malicious act of his employer. Yet, that is the effect of our decisions in *Great Western Sugar*, *Noonan*, and the majority opinion in this case.

Therefore, I conclude that the decisions relied on by the majority have misconstrued the plain terms of the Workers' Compensation Act and have judicially legislated requirements which are not in the Act. For these reasons, I would not follow those prior decisions.

I conclude that the acts alleged in Blythe's complaint were both "intentional" and "malicious" as defined by statute in Montana and our prior case law. Therefore, I would reverse the judgment of the District Court and remand this case to the District Court for further proceedings to determine whether Blythe's allegations are true.

_____
Justice

Justices John C. Harrison and William E. Hunt, Sr., join in the foregoing dissent.

_____

_____
Justices

24